IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Garey E. Lindsey, Regional Director of the
NATIONAL LABOR RELATIONS BOARD,	Case No: 2:18-cv-1165

      Petitioner,	Judge Graham

  v.

Shamrock Cartage, Inc.

      Respondent.

<u>Order and Injunction</u>

      Petitioner Garey E. Lindsay, Regional Director of the National Labor Relations Board, petitions the court for a preliminary injunction under Section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j). The Director alleges that respondent Shamrock Cartage, Inc. engaged in an unfair labor practice by suspending and later terminating an employee, Shane Smith, because he was a key player in the efforts of International Brotherhood of Teamsters Local Union No. 413 to organize Shamrock's yard workers. The Director seeks a Section 10(j) injunction that, among other things, would require Shamrock to reinstate Smith's employment pending the resolution of unfair labor practices charges brought before the Board. For the reasons stated below, the petition is GRANTED.

**I.	Factual Background**

      Shamrock provides services to a DHL shipping facility in Groveport, Ohio and to a Ryder Logistics facility in Obetz, Ohio. Shamrock facilitates the spotting and movement of containers, processes and sorts products, and prepares trucks and trailers for shipment in warehouses and yards at these facilities. The Union represents about twelve yard workers at the two facilities.

      Shane Smith began working for Shamrock in April 2017 at a Kraft Foods warehouse in the DHL facility. He was the main supporter of the Union's efforts to organize Shamrock's yard workers in the summer of 2017. The Union petitioned on August 7, 2017 for an election. Smith was terminated on the next day. Smith's supervisor at the time, Jason Caccamo, unsuccessfully objected to his superiors about their instruction to fire Smith because he thought it would be illegal in light of Smith's union activity. Caccamo Aff. at p. 6.

On August 10, 2017, the Union filed a charge with the NLRB against Shamrock regarding Smith's termination. In November the parties reached a settlement whereby Smith was reinstated, the election was set aside and the Union was recognized.

Upon Smith's reinstatement, Caccamo was directed by his superiors to watch Smith "like a hawk." Caccamo Aff. at p. 7. According to Caccamo, his superiors were worried that Shamrock would lose their contract with DHL and Kraft if they became aware of union activity. Id. at pp. 6-7. Caccamo was told to follow Smith everywhere he went "so he wouldn't be causing any problems." Id.

Smith became a shop steward in November 2017 and joined the Union's bargaining committee. Smith Aff. at pp. 2-3. In January 2018, the Union and Shamrock began bargaining for a first contract. Smith participated in the bargaining sessions. Id. at p. 3. By April 2018, the parties disagreed over disciplinary policy and bargaining stalled when the Union insisted on a just-cause provision. Beardsley Aff. at pp. 1-2.

At about this same time, Brian Williamson succeeded Caccamo as Smith's supervisor. According to Smith, Williamson told him that he would put problem workers on Smith's shift as payback for Smith and the Union disagreeing with Shamrock's proposed disciplinary policy. Smith Aff. at p. 4.

On April 9, Smith and Williamson discussed a problem which Smith had been having with the computer positioning system in his truck. Williamson gave Smith permission to contact the vendor responsible for the computer system, PINC. Smith did so over his lunch break. During the phone call, Smith made mention of another truck, not his own, whose computer system had been down for a few months. The PINC representative said they had sent something to DHL, who said they were waiting on Kraft. Smith suggested that PINC send an email to Williamson about getting direct contact information for the people at Kraft. Smith Aff. at pp. 4-6.

About three hours later, Williamson told Smith that he was "suspended pending investigation leading to termination." Id. at p. 6. Williamson said that he had received an email from PINC about the other truck and had forwarded the email to his superiors. Smith understood from Williamson that Shamrock's stated reason for suspending him was that he told PINC to send an email to Williamson. Id. at pp. 6-7.

Williamson had a separate conversation with Caccamo in which he confided that management was always unhappy with Smith because of his "past history with the company." Caccamo Aff. at pp.

2

4-5. Management rationalized disciplining Smith on the basis that he had interfered with a contract between Kraft and PINC. Id. at p. 5.

On April 11, Smith and the Union's business agent met with Shamrock's representatives and legal counsel. The Union asserted that Smith had done nothing improper and had done nothing to warrant termination. Shamrock indicated that they would investigate but were inclined to terminate Smith based upon Williamson's denial that he granted Smith permission to contact PINC. Id. at p. 8.

On April 12, Shamrock terminated Smith's employment.

On May 1, 2018, the Union filed a charge of an unfair labor practice against Shamrock, alleging that Shamrock terminated Smith in retaliation for engaging in protected, concerted activity. The Regional Director issued a complaint against Shamrock on July 19 and an amended complaint on September 12. The complaint was scheduled to be heard by an administrative law judge on November 5, 2018.

## II. Discussion

Section 10(j) of the NLRA authorizes the Board, upon issuance of a complaint charging that any person has engaged in an unfair labor practice, to petition a United States district court "for appropriate temporary relief or restraining order." 29 U.S.C. § 160(j). The availability of a Section 10(j) injunction gives "the Board a means of preserving the status quo pending completion of its regular procedures, which might be ineffective if immediate relief cannot be granted." Calatrello v. Automatic Sprinkler Corp. of Am., 55 F.3d 208, 214 (6th Cir. 1995) (internal quotation marks and citations omitted). In deciding whether to grant the petition, "district courts are *not* to adjudicate the merits of the unfair labor practice case. The question of whether a violation of the Act has been committed is a function reserved exclusively to the Board, subject to appellate court review of final Board orders." Fleischut v. Nixon Detroit Diesel, Inc., 859 F.2d 26, 28 (6th Cir. 1988) (emphasis in original).

In order to issue a Section 10(j) injunction, a district court must find that "(1) there is reasonable cause to believe that unfair labor practices have occurred, and that (2) injunctive relief with respect to such practices would be just and proper." Ahearn v. Jackson Hosp. Corp., 351 F.3d 226, 234 (6th Cir. 2003) (internal quotation marks omitted).

### A. Reasonable Cause

The Regional Director's burden to show reasonable cause is "relatively insubstantial" and "requires only that the Board's legal theory underlying the allegations of unfair labor practices be

3

substantial and not frivolous and that the facts of the case be consistent with the Board's legal theory." Ahearn, 351 F.3d at 237 (internal quotation marks and citations omitted).  In reviewing the facts, "a district court 'need not resolve conflicting evidence between the parties' or make credibility determinations."  Id. (quoting Schaub v. West Mich. Plumbing & Heating, Inc., 250 F.3d 962, 969 (6th Cir. 2001)).  Rather, reasonable cause is shown "so long as facts exist which could support the Board's theory of liability."  Schaub, 250 F.3d at 969.  See also Glasser v. ADT Sec. Services, Inc., No. 09-1829, 2010 WL 2196084, at *2 (6th Cir. June 2, 2010) ("'[T]he Board must present enough evidence in support of its coherent legal theory to permit a rational factfinder, considering the evidence in the light most favorable to the Board, to rule in favor of the Board.'") (quoting Arlook v. S. Lichtenberg & Co., Inc., 952 F.2d 367, 371 (11th Cir. 1992)).

It is an unfair labor practice for an employer to interfere with the rights of employees under the NLRA, to discriminate with respect to terms and conditions of employment so as to encourage or discourage membership in a labor organization, or to discharge or discriminate against an employee because he has filed charges or given testimony to the Board.  29 U.S.C. § 158(a)(1), (3), (4).  The NLRA gives employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. "The test for determining whether an employer has violated section 8(a)(1) is whether the employer's conduct tends to be coercive or tends to interfere with the employees' exercise of their rights." N.L.R.B. v. Main St. Terrace Care Ctr., 218 F.3d 531, 537 (6th Cir. 2000) (internal quotation marks omitted).

The provisions of Section 8(a)(1) are violated if the employee engages in activity protected by the Act, the employer knows of the activity, and the employer takes adverse employment action which is motivated by the employee's protected activity.  Gatliff Coal Co. v. N.L.R.B., 953 F.2d 247, 251 (6th Cir. 1992).

The court finds that the Director has met his burden of showing there is reasonable cause to believe that unfair labor practices have occurred.  The Director has produced evidence that Smith engaged in protected activity.  Indeed, it is undisputed that Smith was a primary supporter of organization efforts in the summer of 2017 and that, upon his reinstatement in November 2017, he became a shop steward and participated in the bargaining for a first contract.  It is further undisputed that Shamrock's owners, management and Smith's immediate supervisors knew of his union-related activities.

Shamrock took adverse action against Smith when they suspended and terminated him. A reasonable factfinder examining the Director's evidence could find that the action was motivated by Smith's protected activity. The Director provides several examples of Shamrock's anti-union animus against Smith. One is Shamrock's firing of Smith in August 2017 after the Union filed a petition for an election. Although that firing is not at issue in the current NLRB charge, a rational factfinder still could consider the timing of it to be evidence of Shamrock's anti-union animus. The Director has also submitted evidence that Shamrock's management feared that union activity would jeopardize its contract with DHL and Kraft. To this end, upon Smith's reinstatement Shamrock's management instructed his then-supervisor, Caccamo, to closely scrutinize him and terminate him if he "did anything close to incorrect." Caccamo Aff. at p. 7.

According to the Director's evidence, another supervisor, Williamson, threatened to put problematic workers on Smith's shift in retaliation for the Union's bargaining position on disciplinary policy. Smith's affidavit states that Williamson himself made the causal connection between the threat and the union activity. When Smith asked about Williamson putting "bad workers" on his shift, saying, "[W]hy is that?," Williamson responded with, "[You] wouldn't give us any agreed-upon language for progressive discipline." Smith Aff. at p. 4. Williamson explained that since Shamrock could not discipline the workers in the manner they wanted, Smith would be forced to deal with the fallout of being "stuck" with them. Id.

The timing of Smith's suspension and termination also supports the Director's position. Shamrock suspended Smith just one or two work days after the most recent round of bargaining in which the Union did not agree to a proposed temporary disciplinary policy. Smith Aff. at p. 4; Beardsley Aff. at pp. 1-2. Williamson confided that management was unhappy with Smith because of his "past history with the company," Caccamo Aff. at pp. 4-5, and a reasonable factfinder could find that this "past history" included Smith's union activity.

Shamrock denies that its management or supervisors made the anti-union statements that the Director alleges they did. The court, however, does not make credibility determinations or weigh the evidence in evaluating whether the Director has shown reasonable cause. Ahearn, 351 F.3d at 237.

Shamrock also argues that it had a legitimate, non-discriminatory reason for terminating Smith's employment. Shamrock details the ways in which Smith himself was a problematic worker and had run-ins with other employees. It argues that Smith's call to PINC was the "last straw" because he injected himself into Shamrock's relationship with DHL and Kraft. According to Shamrock,

5

Smith's call resulted in PINC issuing a purchase order to DHL and Kraft and forced Shamrock to expend time apologizing for the disturbance.

The court finds that Shamrock's evidence and argument is insufficient, in the context of a Section 10(j) injunction request, to establish that the Director has failed to show reasonable cause. In arguing that Smith was a problematic worker, Shamrock relies on incidents from August 2017 for which Shamrock agreed, in the November 2017 settlement agreement before the NLRB, not to use against Smith. See Doc. 1-11 at PAGEID 109.

Further, the Director points to evidence that Smith's call to PINC was not the real reason for his termination. In suspending and terminating Smith, Shamrock did not follow its own progressive disciplinary policy. Smith had no record of discipline at the time and was considered by Caccamo to have done "an amazing job." Caccamo Aff. at p. 7. Shamrock had no policy prescribing Smith's conduct, and Williamson in fact gave Smith permission to contact PINC. Other employees directly contacted PINC without repercussion from Shamrock. Caccamo Aff. at pp. 2-3. And it is uncertain that Smith's inquiry about the other truck actually jeopardized Shamrock's relationship with DHL and Kraft, or if it was a mere inconvenience. The PINC purchase order was generated in February 2018, well before Smith called PINC. See Doc. 9-8 at PAGEID 205. By Smith's account, he did not authorize PINC to send or re-send a purchase order to Kraft, but merely said that PINC should contact Williamson to discuss it. Smith Aff. at p. 6.

In sum, the Director has satisfied his burden of showing that there is reasonable cause to believe that Shamrock has committed unfair labor practices.

### B. Just and Proper

The requirement that injunctive relief be just and proper "turns primarily on whether a temporary injunction is necessary to protect the Board's remedial powers under the [NLRA]." Ahearn, 351 F.3d at 239 (internal quotation marks and citations omitted). Interim injunctive relief is often appropriate in cases where the employer has discharged an employee who is prominent in their union-related activity – even more so when efforts at organizing and bargaining are taking place. The removal of a key participant both weakens the unit and chills others who might then waiver in their support for fear of suffering adverse action. Without reinstatement, any final remedy which the Board might impose could well be rendered ineffective. See, e.g., Schaub, 250 F.3d at 971 ("[T]he absence of the only union organizer at the company for an extended period of time could irreparably harm the union's chances of organizing the employees.") (internal quotation marks and alteration omitted); Frankl ex rel. N.L.R.B. v. HTH Corp., 693 F.3d 1051, 1066 (9th Cir. 2012) ("[D]iscipline and

6

termination of Villanueva are likely to cause irreparable harm because the discipline and discharge of active and open union supporters sends a message that the employer will take action against union supporters, which adversely impacts employee interest in and support of unionization.") (internal quotation marks omitted).

Shamrock argues that the Union never enjoyed majority support from the workforce to begin with. It points to the result of the 2017 election. However, as the Director notes, the result of that election was set aside by agreement after the NLRB issued a complaint alleging that Shamrock had engaged in unfair labor practices during the campaign leading up to the election. The result of the settlement agreement is that the Union was recognized. Now in its infancy and bargaining for a first contract, the Union is particularly susceptible to harm if Smith is not reinstated.

## III. Injunction

The Director's petition for an injunction under Section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j), is GRANTED.

Pending the final disposition of the matters involved before the National Labor Relations Board, Respondent Shamrock Cartage, Inc. (and its officers, representatives, agents, servants, employees, attorneys, successors and assigns, and all persons acting in concert or participation with it) is hereby enjoined from:

(a) Threatening employees with more onerous working conditions because of the Union's lawful bargaining positions;

(b) Disciplining or discharging employees for their protected Union support, Union activity, participation in Board proceedings, or other activity protected by Section 7 of the National Labor Relations Act; and

(c) In any like or related manner, interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed in Section 7 of the Act.

It is further ordered that, pending the final disposition of the matters before the National Labor Relations Board, Respondent Shamrock Cartage, Inc. (and its officers, representatives, agents, servants, employees, attorneys, successors and assigns, and all persons acting in concert or participation with it), shall take the following affirmative action:

(a) On an interim basis, within five (5) days from the date of the District Court's Order, offer Shane Smith, in writing, immediate reinstatement to his former position, or, only if that position no longer exists, to a substantially equivalent position, without prejudice to his

7

seniority or any other rights and privileges previously enjoyed and displacing, if necessary, any person who has been hired or reassigned to replace him;

(b) On an interim basis, within five (5) days from the date of the Order, rescind the suspension of Smith from April 9 to April 12, 2018, and inform Smith that it has done so;

(c) Within seven (7) days from the date of the District Court's Order, post copies of the Order at all locations in respondent's facilities where notices to employees are customarily posted and maintain such notices free from all obstructions or defacements pending conclusion of the Board's administrative proceeding;

(d) Within ten (10) days from the date of the District Court's Order: (i) Hold one or more mandatory employee meetings on work time at times when respondent customarily holds employee meetings and scheduled to ensure the widest possible employee attendance, at which the Court's order will be read to the bargaining unit employees by a responsible management representative of respondent in the presence of a Board agent and the Union, or, at respondent's option, by a Board agent in the presence of a responsible management official; (ii) Announce such meetings in the same manner it would customarily announce a meeting of employees; (iii) Require that all unit employees attend such a meeting; and;

(e) Within twenty (20) days of the issuance of this Order, file with the District Court and serve a copy upon the Regional Director of Region 9 of the Board, a sworn affidavit from a responsible official which describes with specificity how respondent has complied with the terms of this decree, including the exact locations where respondent has posted the Order.

IT IS SO ORDERED.

s/ James L. Graham  
JAMES L. GRAHAM  
United States District Judge

DATE: December 12, 2018